UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                   :

UNITED STATES OF AMERICA,      :
                                   :

   - v. -                  :          S2 12 Cr. 750 (NRB)
                                   :

ALLEN REICHMAN,           :
                                   :

                Defendant.    :
                                   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -x


GOVERNMENT'S MOTION *IN LIMINE*


                                           PREET BHARARA
                                           United States Attorney for the
                                           Southern District of New York
                                           One St. Andrew's Plaza
                                           New York, New York 10007


Janis M. Echenberg
Daniel B. Tehrani
Assistant United States Attorneys
-Of Counsel-

# TABLE OF CONTENTS

I.    The Court Should Preclude Argument or Evidence Suggesting that Oppenheimer Was Allegedly Negligent or Careless in Failing to Stop the Fraud ..................................................... 1

II.   Evidence of the Defendant's Prior Acts Is Admissible ..................................................... 4

   A.   Prior Conduct ............................................................................................................. 5

   B.   Applicable Law ........................................................................................................... 10

   C.   Discussion ................................................................................................................... 16

III.  To the Extent the Proffered Evidence Is Not Admitted as Direct Evidence or 404(b), the Prior Acts Are Proper Grounds for Cross-Examination of Reichman ..................................... 21

Conclusion ................................................................................................................................ 22

## GOVERNMENT'S MOTION *IN LIMINE*

The Government respectfully submits this memorandum of law to seek the following rulings *in limine*.  First, the Government seeks to preclude argument or evidence suggesting that Oppenheimer (or any victim) was allegedly negligent or careless in failing to detect or stop the defendant's fraud.  Second, the Government respectfully requests a ruling that certain evidence of the defendant's prior conduct be admissible as direct evidence of the defendant's fraud, or in the alternative, as evidence of the defendant's intent, motive, absence of mistake and lack of accident.  To the extent the evidence is not deemed admissible in the Government's case-in-chief, the Government also requests a ruling that the defendant may be cross-examined about those topics should he testify at trial.  For the reasons set forth below, the Court should grant the Government's motion.[1]

## I.    The Court Should Preclude Argument or Evidence Suggesting that Oppenheimer Was Allegedly Negligent or Careless in Failing to Stop the Fraud

Based on comments by defense counsel, it appears that certain defense evidence or arguments may improperly suggest to the jury that Oppenheimer is to blame for purportedly failing to stop the fraud perpetrated by the defendant and his co-conspirators.  Any such argument or evidence should be precluded as irrelevant, because the law is clear that a victim's failure to uncover a fraud, even when presented with facts that might indicate that a fraud had been committed, is no defense to a fraud charge.

---

[1] The Government may have additional motions related to the preclusion of cross-examination topics for certain Government witnesses.  As the Government continues to meet with witnesses and conducts inquiries necessary to comply with its disclosure obligations, the Government will confer with defense counsel to see if agreement can be reached on such topics without requiring the Court's involvement.  To the extent it becomes necessary to seek a Court ruling on these witness-specific issues, the Government will seek leave to file any such motion under seal, given the personal nature of the topics at issue.

In *United States* v. *Thomas*, 377 F.3d 232 (2d Cir. 2004), the Second Circuit squarely held that a victim's lack of diligence (if any) in detecting a fraud cannot be used as a defense.  In *Thomas*, the defendant was charged with inducement of travel in interstate commerce for a fraudulent purpose.  At trial, defense counsel cross-examined the victim of the fraud concerning the lack of caution he exercised in his dealings with the defendant.  The District Court questioned the propriety of the line of questioning, noting that it was no defense to fraud that the victim was foolish or made insufficient inquiries, and expressed its concern that defense counsel was insinuating to the jury that the victim could have discovered the fraud had he asked the right questions.  Defense counsel disclaimed any such intent and was directed to move on.  *See id*. at 240-41.  The Second Circuit held the ruling to be an appropriate exercise of the District Court's discretion.  *See id.* at 241.  The Second Circuit also found that it would be no defense that the victim might have discovered the fraud had it probed further, because federal anti-fraud statutes prohibit schemes to defraud, and to establish a scheme to defraud, there is no requirement that the victim act as a person of ordinary prudence would.  *See id*. at 241-42 & 241 n.5.

The Second Circuit and courts in this District have also rejected defendants' attempts to suggest to juries that banks, mortgage lenders and other fraud victims could have discovered the false statements in documents submitted by defendants, and thus that the defendants were not guilty of fraud.  *See, e.g., United States* v. *Amico*, 486 F.3d 764, 780 (2d Cir. 2007) (affirming district court's rejection of a defendants' proposed jury instruction for mail fraud stating that the victim could have discovered false representations in the defendant's mortgage applications, and that the victim's failure to do so constituted a defense, and noting that "[t]he majority of circuits to address the issue have rejected this defense, holding that a victim's lack of sophistication is not relevant to the intent element of mail or wire fraud"); *United States* v. *Isola*, No. 10 Cr. 833

(WHP), 2012 WL 243083 (S.D.N.Y. Jan 11, 2012) ("[The defendant] is incorrect that the banks' failure to verify the false information he provided absolves him of guilt.  A victim's negligence is not a defense to fraud."); *United States* v. *Nekritin*, No. 10-CR-491 (S-2) (KAM), 2011 WL 2462744 (E.D.N.Y. June 17, 2011) ("It is well settled that a fraud victim's negligence in failing to discover the fraudulent scheme is not a defense to a defendant's criminal conduct.").

Federal law also makes clear that whether a lending institution actually was deceived by, or relied upon, a defendant's fraudulent conduct or statements is irrelevant, because the success of a defendant's scheme to defraud is irrelevant under federal anti-fraud statutes.  *See Neder* v. *United States*, 527 U.S. 1, 24-25 (1999) ("The common-law requirement[] of 'justifiable reliance' . . . plainly ha[s] no place in the federal fraud statutes"; "[b]y prohibiting the 'scheme to defraud,' rather than the completed fraud, the elements of reliance and damage would clearly be inconsistent with the statutes Congress enacted.").

Thus, in this case, arguments or evidence suggesting that Oppenheimer – either through its legal department, compliance department or the defendant's direct supervision – should have or could have done more to stop the fraud are irrelevant and should be precluded.  Any purported negligence by Oppenheimer or any of its employees, or any steps Oppenheimer purportedly should have taken to prevent the defendant's fraud from succeeding, are simply irrelevant to whether the defendant participated in the charged scheme and whether he had the intent to defraud.

The Court should similarly preclude any argument that a defendant lacked fraudulent intent because he believed that Oppenheimer would not rely on the defendant's misrepresentations and omissions, and would instead make its own determination of the underlying facts of the transaction.  In other words, the argument is that the defendant made

3

material omissions and misrepresentations of fact, but lacked criminal intent, because he believed that Oppenheimer was going to disregard those lies and omissions and make an entirely independent determination of the facts.  This theory is of course nonsensical – there is no plausible reason for the defendant to misrepresent or fail to disclose material facts if he believed that Oppenheimer would review the entire transaction itself and make its own independent determination of its legality and merits; he would simply tell the truth.  And because this theory is so farfetched, the jury invariably would misinterpret any evidence or argument offered in support of such a theory as instead suggesting that Oppenheimer was careless and unworthy of protection from the fraud.  In other words, an argument that Oppenheimer was going to or should have made its own determinations independent of the defendant's misrepresentations collapses into an improper "blame-the-victim" defense that should be precluded under Rules 401 and 403 of the Federal Rules of Evidence.  *See United States* v. *Kaplan*, 490 F.3d 110, 122 (2d Cir. 2007) (slight probative value of evidence's proper purpose increases likelihood that it will be considered by the jury for its improper purpose).

## II.    Evidence of the Defendant's Prior Acts Is Admissible

The proffered evidence below involves Reichman's repeated deceptions and misrepresentations in an effort to enrich himself, many occurring during the time of the charged offense and with the charged co-conspirators, and all of which demonstrate Reichman's blatant and intentional disregard for policies and procedures designed to prevent illegal and unethical conduct.  All of this conduct is admissible either as direct evidence of the charged conspiracy or

pursuant to Federal Rule of Evidence 404(b), to show motive, knowledge, intent to deceive and lack of mistake.[2]

A.     Prior Conduct

1.     *Improper Conduct with Regard to Oppenheimer Clients*

a)     Reichman Obtained, and Attempted to Obtain, Thousands of Dollars by Deceiving an Elderly Client

Between in or about July 2006 and Mr. Reichman's termination on or about March 26, 2010, Reichman managed the Oppenheimer accounts of an elderly client, worth over $2 million. The client, Gladys Jordan, had also been Reichman's client at his previous employer.  While at Oppenheimer, Reichman misled and deceived Ms. Jordan in an effort to earn higher commissions, to which he was not truly entitled.  Specifically, on numerous occasions between October 2007 and January 2010, Reichman surreptitiously transferred cash out of Ms. Jordan's preference account, an account in which Ms. Jordan paid a fixed percentage fee based on asset value rather than a per transaction commission, into a separate, commission-based account.  He then used that transferred cash to purchase bonds that could and should have been purchased from her preference account, each time earning a commission for himself that he would not have earned had the transaction taken place in the client's preference account.  He thereafter moved the purchased bonds back into the fee-based account.  Through this scheme, Reichman earned approximately $10,000 in commissions to which he was not entitled.  He neither sought permission from nor advised anyone at Oppenheimer of this deceptive investment strategy.[3]

---

[2] The Government continues to investigate all of the conduct described below.  All descriptions of the conduct are based on the Government's current understanding of the facts, and may be supplemented as we continue to investigate Mr. Reichman's background.

[3] The Government is also investigating a bill paying service associated with Ms. Jordan's account, through which she was charged approximately $20,000 per year for the payment of a handful of bills each month.  It appears that the owner of the bill paying service was a close associate of Reichman, which was similarly not disclosed to Oppenheimer. To the extent the

Reichman's scheme was discovered and stopped only after Reichman was terminated and another financial advisor who was assigned to take over the account discovered what Reichman had been doing.  This financial advisor also alerted Oppenheimer that Reichman had used the commission-based account to invest hundreds of thousands of dollars in high risk investments, an unusual strategy when dealing with an elderly woman, earning another approximately $20,000 in commissions.

Prior to this conduct, on or about May 26, 2006 (the date Reichman was hired at Oppenheimer), Ms. Jordan created a living trust and modified her last will and testament, granting nearly half of her estate to Reichman and his children.[4]  Specifically, the will and trust provided a cash bequest of $500,000 to Reichman, and $25,000 to each of his children, as well as the balance of the residuary trust to Reichman.  As Reichman well knew, permission from Oppenheimer's legal department is required for a financial advisor to be a beneficiary of a client's will, given the inherent conflict of interest in being both an agent and a trust beneficiary.  Reichman failed to advise Oppenheimer that he was a beneficiary of Ms. Jordan's will and trust.  After Mr. Reichman's termination at Oppenheimer on or about March 26, 2010, a copy of Ms. Jordan's will was discovered by Oppenheimer, and its existence was made known to Ms. Jordan's son, who had previously been unaware of it.  Shortly thereafter, in or around May 2010,

---

Government uncovers any further failures to disclose, they may also be admissible for the reasons set forth herein.

[4] The Government is continuing to investigate the circumstances surrounding the creation of this new will and trust.  Any acts of dishonesty with respect to Reichman improperly influencing the bequest to him may also be admissible for the reasons set forth herein.  The Government is also continuing to investigate allegations that Reichman attempted to improperly induce another elderly client that he should have power of attorney or some other authority over her assets.

Ms. Jordan revoked all provisions of her will related to Reichman, and executed a new will that did not provide for Reichman or his family.[5]

       b)    <u>Reichman Deceived Allen Highet and Oppenheimer in an Effort to Obtain a Financial Benefit</u>

Between in or about July 2008 and in or about March 2009, while at Oppenheimer, Reichman persuaded a client named Alan Highet to take a job with, and in connection with that job, invest in a company called, International Barcode Corporation, a/k/a Barcode Technology, Inc ("BTI"). Reichman asserted that the CEO of the company, who was a client of his, was also a long-time associate.[6] Through misleading representations and the creation of a false sense of urgency, in or around September 2008, Reichman convinced Mr. Highet to obtain a margin loan on securities held at Oppenheimer in order to fund an approximately $1 million investment in BTI. At the time, or at least by shortly thereafter, Reichman had a personal financial interest in BTI. Such outside investments and potential conflicts of interest must be disclosed under Oppenheimer's compliance policies. Reichman failed to disclose to Mr. Highet (or fully and in a timely manner) to Oppenheimer his true relationship with BTI, a relationship that prevented him from acting purely in the interests of his client and his employer.

In or around June 2009, Reichman sought and received approval by the compliance department to make an investment in BTI, claiming that he would make an investment "upon approval" and falsely asserting that he did not currently have any investments with the company. He also stated that none of the principals were clients of Oppenheimer nor did he have any business or professional relationship with them, in contradiction with what he had told Highet

---

[5] Ms. Jordan passed away in or around July 2011. Reichman is currently challenging his having been removed from Ms. Jordan's will in probate court.

[6] On or about March 31, 2011, BTI's CEO, Cary Bunin, was indicted by the Manhattan District Attorney for securities fraud in connection with his operation of BTI. He has since pleaded guilty and was sentenced to five years' probation in or around September 2012.

when he solicited his investment.  He further affirmed that he was not permitted to offer private or public investments in the company without separate permission, which he never sought.

> 2. *Reichman Participated in Multiple Improper Trips and Speaking Engagements While at Oppenheimer and Failed to Disclose Huff's Criminal Past*

> a) <u>Reichman Took At Least One Lavish Trip with Huff and Antonucci</u>

In or around February 2009, Reichman attended the Super Bowl in Tampa, Florida with his co-conspirators Charles Antonucci ("Antonucci") and Wilbur Anthony Huff ("Huff"), among others.  At his co-conspirators' expense, Reichman flew to Florida on a private jet and sat in box seats at the football game.  Photographs from this trip show Reichman enjoying himself in the luxury box, meeting a celebrity, and golfing with his co-conspirators.  At that time, Antonucci was a long-standing client of Oppenheimer and Huff had accounts open, or in the process of being opened, at Oppenheimer.  The trip immediately followed Antonucci's fraudulent acquisition of Providence Property and Casualty, which was funded by a margin loan from Oppenheimer, fraudulently facilitated by Reichman on Antonucci and Huff's behalf.  This trip was in blatant violation of Oppenheimer's compliance policies, which state, in relevant part, "employees . . . are prohibited from accepting any gifts or special favors from any person or organization with which the Firm has a current or potential business relationship."[7]

> b) <u>Reichman Traveled at Huff's Expense to Make Presentations to Huff's Investors</u>

In or about October 2008, and again in or about May 2009, Reichman met with potential investors and/or presented at conferences for Accredited Investor Resources ("AIR"), a group of investors organized by Huff.  At these conferences, which were held at luxury resorts in North

---

[7] The Government also believes – but is continuing to investigate – that Reichman was also Huff's guest at the Kentucky Derby in or around the time of the charged conspiracy.

Carolina and California, Reichman presented himself as representing Oppenheimer. Oppenheimer's compliance manual states, in relevant part, that "[b]efore accepting a speaking engagement or public appearance . . . an employee must obtain the approval of his or her Branch Office Manager and the Advertising Principal on the Public Appearance Form."   While the Government continues to investigate whether Reichman sought and obtained the appropriate approval to participate in these conferences,[8] Reichman failed to disclose that he traveled to and from these events on a private plane provided by Huff.

c)   <u>Reichman Failed to Disclose Huff's Criminal Past</u>

In addition to failing to disclose the substantial gifts he received from Anthony Huff, Reichman failed to disclose Huff's criminal history – of which he was very much aware – to supervision or compliance at Oppenheimer.  The Government expects the evidence at trial will also show that, in or around July 2008, Reichman learned that Huff had been convicted, in or around 2004, of mail fraud involving improper use of loan proceeds that were intended to be used to pay insurance company premiums.  At the same time, Reichman learned that Huff was being sued by the SEC for violations of securities laws.  Reichman failed to disclose to Oppenheimer's legal or compliance departments that he was working closely with an individual with such a questionable background.  Indeed, it was not until the issue was raised by another Oppenheimer employee that Reichman brought in Huff's attorney in an effort to minimize the significance of Huff's prior conduct.

---

[8] Oppenheimer's compliance files reflect that Reichman sought approval for the October 2008 speaking engagement, which appears to be the sole time he was granted outside speaking approval while at Oppenheimer.  His approval to speak was contingent on him making certain changes to his proposed PowerPoint presentation.  The PowerPoint presentation that appears to have been given at the conference does not contain all of the changes requested by Compliance and in fact appears to contain additional or different slides than presented to Compliance.

      *3.*     *Reichman's Improper Conduct at His Prior Employer*

Reichman was terminated in or around June 2004 by a prior employer ("Employer-1")

for improper use of technology.  Specifically, he transmitted inappropriate material via electronic

material in violation of Employer-1's policy.  On his application for employment at

Oppenheimer, when asked "Were you ever discharged from any position?," Reichman failed to

answer the question.

      B.     <u>Applicable Law</u>

      *1.*     *Direct Evidence of the Charged Crimes Is Admissible*

The Federal Rules of Evidence "direct the trial judge generally to admit all evidence

having 'any tendency' to make the existence of a material fact 'more probable or less probable

than it would be without the evidence.'"  *Tome* v. *United States*, 513 U.S. 150, 174 (1995)

(quoting Fed. R. Evid. 401, 402).  It is well-established that all relevant evidence "is admissible

unless the Rules provide otherwise."  *Huddleston* v. *United States*, 485 U.S. 681, 687 (1988).

"To be relevant, evidence need only tend to prove the government's case, and evidence that adds

context and dimension to the government's proof of the charges can have that tendency."  *United*

*States* v. *Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997).  Acts that are committed as part of a

charged conspiracy or scheme are plainly relevant.  *See United States* v. *Concepcion*, 983 F.2d

369, 392 (2d Cir. 1992) ("An act that is alleged to have been done in furtherance of the alleged

conspiracy, however, is not an 'other act' within the meaning of Rule 404(b); rather, it is part of

the very act charged.").

The Second Circuit has repeatedly held that uncharged acts are admissible in a

conspiracy case where they are used to: (i) explain the development of the illegal relationship

between co-conspirators or (ii) explain the mutual trust that existed between co-conspirators.

*United States* v. *Mercado*, 573 F.3d 138, 141 (2d Cir. 2009) (holding that prior bad acts were

properly admitted to show "the development of the relationship between Defendant and [the cooperating witness,] provid[ing] background for the events alleged in the indictment and enabl[ing] the jury to understand the complete story of the crimes charged, or how the illegal relationship between coconspirators developed." (quotation omitted)); *United States* v. *Tartir*, 347 F. App'x 655, 657 (2d Cir. 2009) (testimony about conspirator's "prior acts was admissible as direct evidence because it provided background related to [defendant's] relationship with [co-conspirator] and was some evidence that a conspiracy existed"); *United States* v. *Rahim*, 339 F. App'x 19, 23 (2d Cir. 2009) ("[E]vidence of [conspirators'] activities with respect to [conspirator's] prior employer was properly admitted because it was relevant information of the 'the background of the conspiracy charged and [the development of] the illegal relationship between participants in the crime.'" (quoting *United States* v. *Rosa*, 11 F.3d 315, 334 (2d Cir.1993))); *United States* v. *Rybicki*, 38 F. App'x 626, 632-33 (2d Cir. 2002) (evidence of prior acts between coconspirators admissible to show development of relationship between co-conspirators); *United States v. Pascarella*, 84 F.3d 61, 73 (2d Cir. 1996) (holding that other act evidence is admissible "to show the background of a conspiracy or the development of a relationship of trust between the participants"); *United States v. Pipola*, 83 F.3d 556, 565 (2d Cir. 1996) ("One legitimate purpose for presenting evidence of extrinsic acts is to explain how a criminal relationship developed; this sort of proof furnishes admissible background information in a conspiracy case"); *United States v. Brennan*, 798 F.2d 581, 589 (2d Cir. 1986) (prior-act evidence admitted since it "show[ed] to the jury how [racketeers'] illegal relationship developed," "inform[ed] the jury of the background of the charged conspirac[ies,]" and "show[ed] the basis for [each] defendant's trust of the others").

In addition, evidence of an uncharged act is admissible as direct evidence if the uncharged act (i) arose out of the same transaction or series of transactions as the charged offense, (ii) is inextricably intertwined with the evidence regarding the charged offense, or (iii) completes the story of the crime charged. *See United States* v. *Hsu*, 669 F.3d 112, 118-19 (2d Cir. 2012) (affirming district court's admission, as direct evidence, of testimony that defendant had engaged in a Ponzi scheme contemporaneously with, and arguably related to, the campaign finance violations with which defendant was charged and convicted at trial); *United States* v. *Rigas,* 490 F.3d 208, 238-39 (2d Cir. 2007) (affirming district court's decision to permit Government to adduce evidence of uncharged fraudulent acts predating the charged conspiracy as direct proof of charged accounting fraud conspiracy because the evidence "arose out of the same transaction or series of transactions as the charged offense, [were] inextricably intertwined with the evidence regarding the charged offense, or [were] necessary to complete the story of the crime on trial" (quotation omitted)); *United States* v. *Carboni*, 204 F.3d 39, 44 (2d Cir. 2000) (in case charging false statements to maintain a line of credit, affirming admissibility of uncharged acts of falsification of business inventory, which occurred at or around the same time as the charged crimes, as direct proof inextricably intertwined with charged conduct); *United States* v. *Gonzalez*, 110 F.3d 936, 942 (2d Cir. 1997) (affirming that "[i]t is well established that 'evidence of uncharged criminal activity is not considered "other crimes" evidence under Fed. R. Evid. 404(b) if it 'arose out of the same transaction or series of transactions as the charged offense, if it [is] inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime [on] trial'").

> ### 2.     *Other Act Evidence Is Admissible Pursuant to Rule 404(b)*

It is well settled that "other acts" evidence is also admissible under Rule 404(b) so long as the evidence: (1) is advanced for a proper purpose; (2) is relevant to the crimes for which the

defendant is on trial; and (3) has probative value that is not substantially outweighed by any unfair prejudicial effect.  If requested, such evidence must be admitted with limiting instructions to the jury.  *See United States* v. *Curley*, 639 F.3d 50, 57 (2d Cir. 2011); *United States* v. *Zackson*, 12 F.3d 1178, 1182 (2d Cir. 1993); *United States* v. *Ramirez*, 894 F.2d 565, 568 (2d Cir. 1990); *United States* v. *Smith*, 727 F.2d 214, 219-20 (2d Cir. 1984); *United States* v. *Siegal*, 717 F.2d 9, 16-17 (2d Cir. 1983); *United States* v. *Ortiz*, 857 F.2d 900, 903 (2d Cir. 1988) ("[O]ther acts or crimes are admissible under Rule 404(b) to prove matters other than the defendant's criminal propensity.").  Rule 404(b) permits the admission of "other act" evidence for purposes "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."  Fed. R. Evid. 404(b).  A defendant's knowledge and intent is in issue unless the defendant has unequivocally conceded that element of the offense.  *See, e.g.*, *United States* v. *Colon*, 880 F.2d 650, 656-57 (2d Cir. 1989); *United States* v. *Peterson*, 808 F.2d 969, 974 (2d Cir. 1987); *see also United States* v. *Ramirez*, 894 F.2d 565, 568 (2d Cir. 1990) (holding that when the defendant "disavows awareness that a crime was being perpetrated" and the government bears the burden of proving knowledge "as an element of the crime, knowledge is properly put in issue").

The Second Circuit "has adopted an 'inclusionary' approach to other act evidence under Rule 404(b), which allows such evidence to be admitted for any purpose other than to demonstrate criminal propensity."  *United States* v. *LaFlam*, 369 F.3d 153, 156 (2d Cir. 2004); *see also United States* v. *Curley*, 639 F.3d at 56; *United States* v. *McCallum*, 584 F.3d 471, 474-75 (2d Cir. 2009).  The Second Circuit has further routinely approved of the admission of other-act evidence with respect to the issues of knowledge and intent where, as is likely to be the case here, those issues are in dispute.  *See, e.g.*, *United States* v. *Germosen*, 139 F.3d 120, 127-28 (2d

13

Cir. 1998); *United States* v. *Pascarella*, 84 F.3d at 69; *United States* v. *Myerson*, 18 F.3d 153, 166 67 (2d Cir. 1994); *United States* v. *Zackson*, 12 F.3d at 1182. The Court has held that "[f]or uncharged crime to be probative of knowledge and intent, '[t]he government must identify a similarity or connection between the two acts.'" *United States* v. *Paulino*, 445 F.3d 211, 223 (2d Cir. 2006) (internal citations omitted); *see also United States* v. *Cadet*, 664 F.3d 27, 32-33 (2d Cir. 2011) (affirming "sufficiently similar" actions to the charged conduct were relevant to – and indeed "highly probative of" knowledge and intent for fraud). "Similarity being a matter of relevancy, is judged by the degree in which the prior act approaches near identity with the elements of the offense charge[d]. There is no necessity for synonymity but there must be substantial relevancy." *United States* v. *Perez*, 325 F.3d 115, 129 (2d Cir. 2003) (internal citations omitted).

In the fraud context, the Second Circuit has affirmed the admission of evidence of the defendant's previous participation in a substantially similar scheme where the defendant denied having knowledge or fraudulent intent. *See United States* v. *Downing*, 297 F.3d 52, 59 (2d Cir. 2002) (affirming conviction in "pump and dump" securities fraud scheme where evidence had been admitted that defendant had prepared false audit reports to facilitate a separate securities fraud scheme); *accord United States* v. *Zedner*, 401 F.3d 36, 49 50 (2d Cir. 2005) (in bank fraud case, evidence of two uncharged schemes to defraud banks – different from the charged scheme – relevant as similar act under Rule 404(b) because "[t]estimony about other fraudulent acts tended to prove [the defendant's] financial sophistication, his ability to execute complex schemes, and his ability to form intent to defraud"), overruled on other grounds by *Zedner* v. *United States*, 547 U.S. 489 (2006); *Pascarella*, 84 F.3d at 69 (where the defendant claimed that he did not know that the checks he deposited were stolen, evidence of prior stolen checks

deposited into the same account was admissible to prove the defendant's knowledge); *United States* v. *Birrell*, 447 F.2d 1168, 1172 (2d Cir. 1971) ("[e]vidence of similar acts in fraud cases may be introduced where knowledge or intent is at issue, to give rise to an inference of knowledge or intent"); *United States* v. *Robbins*, 340 F.2d 684, 686-88 (2d Cir. 1965) (where defendant accused of providing fraudulent and forged bills of lading to obtain financing, four additional occasions in which the defendant presented the same entity with fraudulent bills of lading were admitted "for the limited purpose of establishing that the acts charged in the indictment were committed knowingly and intentionally and were not the result of error or mistake"); *United States* v. *Rahim*, 339 F. App'x at 23 (admission of similar conduct at a different bank was admissible in a securities fraud case under Rule 404(b), because it tended to show the absence of mistake or accident); *United States* v. *Reed*, 639 F.2d 896, 906-07 (2d Cir. 1981) (upholding introduction of evidence about defendant's contemporaneous stock transactions with another brokerage company under Rule 404(b) to prove intent and common scheme or plan in a prosecution for mail fraud and securities fraud).

### 3. Balancing Under Rule 403

Federal Rule of Evidence 403 gives district courts discretion to exclude evidence only if its probative value is *substantially outweighed* by the danger of unfair prejudice to the defendant. Fed. R. Evid. 403 (emphasis added). As the Second Circuit has explained:

> To be sure, all evidence incriminating a defendant is, in one sense of the term, "prejudicial" to him: that is, it does harm to him. In that sense, the more pertinent evidence is, the more prejudicial it is. What "prejudice" as used in Rule 403 means is that the admission is, as the rule itself literally requires, "unfair" rather than "harmful."

*United States* v. *Jimenez*, 789 F.2d 167, 171 (2d Cir. 1986); *see United States* v. *Diaz*, 878 F.2d 608, 615 (2d Cir.), *cert. denied*, 493 U.S. 993 (1989); *see also Oregon* v. *Kennedy*, 456 U.S. 667, 674 (1982) ("Every act on the part of a rational prosecutor during a trial is designed to

'prejudice' the defendant by placing before the judge or jury evidence leading to a finding of his guilt").  Unfair prejudice is prejudice that "tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence."  *United States* v. *Gilliam*, 994 F.2d 97, 100 (2d Cir.) (internal quotation marks omitted) (quoting *United States* v. *Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980)); *see also United States* v. *Ebner*, 782 F.2d 1120, 1126 (2d Cir. 1986) (upholding admission of evidence against Rule 403 challenge in light of limiting instructions and "presumption that juries will follow [them]") (quoting *Watkins* v. *Sowders*, 449 U.S. 341, 347 (1981)).  That the similar act evidence is no more inflammatory or shocking than the charged conduct weighs in favor of admission.  *See United States* v. *Pitre*, 960 F.2d 1112, 1120 (2d Cir. 1992) (Rule 403 did not preclude Rule 404(b) evidence of prior narcotics transactions that were not "any more sensational or disturbing" than charged crime) (quoting *United States* v. *Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990)).  Moreover, the Court can guard against any potential prejudice by a jury instruction regarding the proper and improper uses of such evidence.  *See, e.g., United States* v. *Lasanta*, 978 F.2d 1300, 1308 (2d Cir. 1992); *United States* v. *Levy*, 731 F.2d 997, 1002 (2d Cir. 1984).

C.     Discussion

1.     *Evidence of Reichman's Travel and Participation in Unapproved Social and Business Activities with Antonucci and Huff and Evidence of Reichman's Failure to Disclose Huff's Past Are Admissible*

The evidence that Reichman traveled with Huff and Antonucci to the Super Bowl, and participated in AIR conferences on Huff's behalf, and at Huff's expense, all in violation of Oppenheimer's conflict of interest policy, is admissible as direct evidence to establish the corrupt relationship between Reichman his co-conspirators.  In addition, the trips, two of which occurred almost as bookends at the beginning and end of Reichman's successful facilitation of the illegal

loan for Antonucci and Huff, are inextricably intertwined with and help explain the charged offense.

Reichman's corrupt relationship with Huff and Antonucci is at the center of this scheme. The jury's understanding of this relationship is important to complete the story of crime charged. The Government expects that multiple witnesses will testify that during and prior to the insurance fraud scheme, Reichman described Antonucci as a long-time friend.  Furthermore, the Government expects that the evidence at trial will establish that Huff was as much Reichman's client (albeit unofficially) on the insurance transaction as was Antonucci, and that both interacted with Reichman regularly as the transaction progressed.

In or around October 2008, shortly after learning of Huff's history, and just as the charged insurance fraud scheme was coming to fruition, Reichman was invited to speak at the first AIR conference.  And Reichman was invited to the Super Bowl just after his successful facilitation of the illegal loan.  The timing is not a coincidence; it is critical to telling the story of the crime.  *See United States* v. *Rigas*, 490 F.3d at 238-39.  It is through these trips, which involved multiple group meals, golfing and enjoyment of at least one major sporting event, that the co-conspirators developed a mutual trust and continued to discuss and develop the fraudulent scheme.  *See Pascarella*¸ 84 F.3d at 73.  Reichman's failure to disclose the pertinent details of these trips, which would likely not have been approved by Oppenheimer because they represent lucrative gifts from clients of the company, is further evidence of his dishonest relationship with his co-conspirators.  *See id.*

Similarly, the failure of Reichman to disclose information about Huff's criminal past – information he acknowledged would be relevant to Oppenheimer – is direct evidence of the corrupt scheme and the nature of the co-conspirators' corrupt relationship.  The fact that

17

Reichman was prepared to conceal material information from Oppenheimer in order to continue to cultivate what Reichman hoped would be lucrative future business, is directly relevant to the nature and development of the conspiratorial relationship.

In the alternative, evidence of these trips and Reichman's failure to disclose Huff's criminal background is admissible as other act evidence to prove Reichman's motive, his intent to deceive and an absence of mistake. *See Zackson*, 12 F.3d at 1182.  With regard to motive, it was Reichman's desire to earn large commissions, which he believed could be obtained through his affiliation with Huff and Antonucci, first through the $30 million loan he enabled, and then through subsequent dealings he hoped to have with them, that led him to conspire with Antonucci, Huff, and others.  As Reichman's correspondence via electronic mail makes clear, he hoped to ingratiate himself to his co-conspirators, whom he perceived to be wealthy and powerful, so that they could bring him more and more business.  It is this promise of more money, both through the fraud they were committing together in connection with the insurance transaction, and through transactions Reichman believed would follow if he was successful in facilitating the illegal loan and ingratiating himself with his co-conspirators, that motivated Reichman to commit the charged crime.  Reichman's participation in these extravagant trips is therefore critical to his developing a closer relationship with his co-conspirators.  Reichman's exposure to Huff's lavish lifestyle, which Reichman is allowed to participate in through the Super Bowl and AIR trips, as well as access to Huff's wealthy investors, were additional motivations for him to engage in fraud with Huff.

Furthermore, his deliberate failure to advise Oppenheimer of the pertinent details of trips he knew violated company policy as well as Huff's criminal background, coupled with the other proffered evidence of repeated failures to inform his employer of the truth about his activities, is

admissible to show knowledge, intent to deceive and a lack of mistake and when he failed to inform, and misled, Oppenheimer about true and illegal nature of the $30 million margin loan at issue in the case. As the Government's expected evidence at trial will show, Reichman was repeatedly told that a margin loan on an insurance company's assets (the very type of loan he ultimately caused Oppenheimer to issue) was illegal and would cause the target insurance company to become insolvent. Instead of heading these warnings, and consulting the legal and compliance departments as he was advised to do, he forged ahead, failing to inform those who might question or prevent the transaction of the true nature of loan. Thus, evidence of prior occasions in which Reichman failed to notify Oppenheimer supervision and obtain required approvals is extremely probative of his intent to deceive and the absence of mistake in failing to notify Oppenheimer supervision of the relevant facts in connection with the charged offense. *See United States* v. *Robbins*, 340 F.2d at 686-88. As the Government expects multiple witnesses will testify, Reichman was known at Oppenheimer as extremely aggressive, and someone who would stop at nothing to push through transactions he wanted to complete, often going around those who told him what he wanted to do was not allowed. Evidence of these repeated and intentional violations of policy are admissible to corroborate this testimony and to rebut Reichman's likely defense that he was unaware or did not understand that what he was doing was wrong. *See United States* v. *Zedner*, 401 F.3d at 49-50.

> 2. *Evidence of Reichman's Improper Conduct with Regard to His Former Clients Is Admissible to Show Knowledge, Intent and Absence of Mistake*

Reichman's intentional deception of two of his former clients is also admissible to show knowledge, intent to deceive and absence of mistake. With regard to Ms. Jordan, Reichman purposefully withheld from his supervisors at Oppenheimer both that he was unnecessarily making trades in a way that earned him a commission to which he was not truly entitled, and that

he had a prohibited conflict of interest as her financial advisor at Oppenheimer when he was also a beneficiary of her estate.  With regard to Highet, Reichman again failed to disclose either to the client or to Oppenheimer his conflict of interest.  In both cases, these were not potential conflicts about which one could debate the merits, but clear conflicts of interest that prevented Reichman from properly representing his clients' and Oppenheimer's interests.  The fact that he was aware of these conflicts, and deliberately chose to conceal them in order to accomplish his personal ends, is admissible to show that he did not mistakenly or innocently withhold information from his supervisors and the legal and compliance departments at Oppenheimer regarding the illegal structure of $30 million loan.  Rather, the evidence shows that Reichman was skilled at making money through deception and misrepresentation of his true activities.  *See id.*

3. *Reichman's Failure to Abide by His Prior Employer's Rules and Regulations and His Failure to Disclose the Circumstances of His Termination in His Oppenheimer Employment Application Are Admissible to Show Knowledge, Intent and Absence of Mistake*

Reichman's failure to comply with rules imposed at his prior employer, and his failure to disclose his resultant termination on his employment application at Oppenheimer, are further admissible to show his knowledge, intent and absence of mistake.  His conduct at his former employer, and then his withholding of that conduct from his Oppenheimer employment application, is yet another incident of disregard of rules and continued concealment to advance his interests, and is admissible for the same reasons as set forth above.

4. *None of the Proffered Evidence Should Be Excluded Under Rule 403*

The proffered evidence is admissible for the aforementioned reasons, and will not be unduly prejudicial, confusing, or wasteful for purposes Rule 403 of the Federal Rules of Evidence.  As discussed above, all of the proffered evidence is admissible and highly probative of Reichman's commission of the charged crimes.  In addition, the proffered evidence will be

brief, straightforward, and not cumulative, and will not unduly delay or confuse the jury.

Moreover, because certain of the proffered evidence is inextricably intertwined with the evidence

of the charged crimes, it will not unduly expand or increase the length of the trial.  Finally, none

of the proffered evidence is unduly prejudicial.  Evidence is unfairly prejudicial, "only when it

tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that

justified its admission into evidence."  *United States* v. *Figueroa*, 618 F.2d 934, 943 (2d Cir.

1980).  The proffered evidence certainly is no more inflammatory than the charged conduct,

which involves an illegal $30 million margin loan and significant losses to various entities.  *See*

*Pitre*, 960 F.2d at 1120.  In the event that Court admits any of the proffered evidence pursuant to

Rule 404(b) rather than as direct evidence, the Court may guard against any potential undue

prejudice that concerns the defendant by instructing the jury about the proper and improper uses

of the "other act" evidence.  Such an instruction serves as an appropriate "final protection"

against possible prejudice.  *See United States* v. *Levy*, 731 F.2d 997, 1002 (2d Cir. 1984).

### III.   To the Extent the Proffered Evidence Is Not Admitted as Direct Evidence or 404(b), the Prior Acts Are Proper Grounds for Cross-Examination of Reichman

Rule 608(b) of the Federal Rules of Evidence provides that:

> Specific instances of the conduct of a witness, for the purpose of attacking
> or supporting the witness' credibility, other than conviction of crime as
> provided in Rule 609, may not be proved by extrinsic evidence.  They
> may, however, in the discretion of the court, if probative of truthfulness or
> untruthfulness, be inquired into on cross examination of the witness (1)
> concerning the witness' character for truthfulness or untruthfulness . . . .

Fed. R. Evid. 608(b).   It is well settled that the scope and extent of cross-examination is within

the sound discretion of the court.  *See United States* v. *Wilkerson*, 361 F.3d 717, 734 (2d Cir.

2004).  To the extent the conduct is probative, the Court may admit it unless the probative value

is substantially outweighed by unfair prejudice, *see United States* v. *Devery*, 935 F. Supp. 393,

21

406 (S.D.N.Y. 1996); *see* Fed. R. Evid. 608(b), 1972 advisory committee note (noting that questioning pursuant to Rule 608(b) is limited by the "overriding protection of Rule 403").

Here, each of Reichman's prior instances of misconduct are directly probative of his truthfulness as they all involve attempts to deceive or mislead his employer and clients about the true nature of his activities.  His intent and knowledge of his criminal activity are expected to be a key issue at trial.  To the extent Reichman chooses to testify, probing his truthfulness with regard to the concealment of his trips with Huff and Antonucci, his involvement and investment activities with Ms. Jordan and Mr. Highet, and his misconduct at his former employer and failure to include reference to it in his Oppenheimer employment application are proper and not unduly prejudicial under Rule 608(b).

## CONCLUSION

For the foregoing reasons, the Court should grant the Government's motion.

Dated: New York, New York
      January 30, 2015

Respectfully submitted,

PREET BHARARA
United States Attorney for the
Southern District of New York

By: _____
     Janis M. Echenberg / Daniel B. Tehrani
     Assistant United States Attorneys
     (212) 637-2597/2455 (phone)
     (212) 637-2620 (fax)