```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :

        - v -                     :         S4 12 Cr. 750 (NRB)

ALLEN REICHMAN,                   :

                                  :
           Defendant.
                                  :
- - - - - - - - - - - - - - - - - - x
```

**GOVERNMENT'S SENTENCING MEMORANDUM**

                                        PREET BHARARA
                                        United States Attorney for the
                                        Southern District of New York
                                        Attorney for the United States
                                            of America

Daniel B. Tehrani
Janis M. Echenberg
Assistant United States Attorneys
    – Of Counsel –

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :

         - v -                    :         S4 12 Cr. 750 (NRB)

ALLEN REICHMAN,                   :

                                  :
         Defendant.
                                  :
- - - - - - - - - - - - - - - - - - x
```

The Government, by and through the attorneys below, respectfully submits this memorandum in connection with the sentencing of defendant Allen Reichman ("Reichman" or the "defendant"), which is scheduled for July 15, 2015 at 3:00 p.m., and in response to the defendant's sentencing memorandum dated July 1, 2015 ("Def. Mem."), in which the defendant asks the Court to impose a non-custodial sentence in this scheme to defraud his employer of $30 million. (Def. Mem. at 49). The parties and the United States Probation Office agree that the Guidelines range applicable to the defendant's conduct is 57 to 60 months' imprisonment. (PSR ¶¶ 5, 112). Ultimately, Probation recommends a slight downward variance, culminating in a sentence of 50 months' imprisonment followed by three years of supervised release. (PSR at 35). For the reasons set forth below, the Government respectfully requests that the Court impose a sentence within the applicable Guidelines range of 57

to 60 months' imprisonment, as such a sentence would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

## BACKGROUND AND FACTUAL SUMMARY

### The Guilty Plea and Plea Agreement

After a multi-year investigation, involving at least six federal and state agencies and two United States Attorney's Offices, Reichman was arrested on October 1, 2012 pursuant to a thirteen-count indictment charging him in one count with his role in the fraudulent purchase of an insurance company.

On February 20, 2015, two weeks before trial and after the filing of motions to sever, to dismiss and *in limine*, Reichman appeared before the Honorable Henry B. Pitman, and pleaded guilty to a superseding Information (the "Information") and pursuant to a plea agreement with the Government (the "Plea Agreement").[1]  The Information charged him with conspiring to commit wire fraud during the illegal $37.5 million purchase of an Oklahoma insurance company, PSR ¶ 2, which carries a maximum term of five years' imprisonment.

Pursuant to the Plea Agreement, the parties agreed that the Guidelines range applicable to the defendant's conduct is as follows:

---

[1] The defendant's plea was subsequently accepted by the Court on February 25, 2015.

>    1.   The applicable Guidelines manual is the November 1, 2014 Guidelines Manual.
>
>    2.   Pursuant to U.S.S.G § 2B1.1(a), the base offense level for the group is 6.
>
>    3.   Because the loss from the offense to which the defendant has pleaded guilty exceeded $20,000,000 but was less than $50,000,000, a 22-level increase is warranted pursuant to U.S.S.G. § 2B1.1(b)(1)(L).

Assuming the defendant's continued acceptance of responsibility, a three-level reduction pursuant to U.S.S.G. § 3E1.1 is appropriate.  Based on the above, the applicable Guidelines offense level in the Plea Agreement was 25.  (PSR ¶ 5).  Because the defendant has no prior criminal history, the parties agreed that he is in Criminal History Category I.

Based on an offense level of 25 and the defendant's Criminal History Category of I, the stipulated Guidelines range in the Plea Agreement is 57 to 71 months' imprisonment.  However, because the statutory maximum sentence for the defendant's conviction is five years' imprisonment, the parties agreed that the Guideline range applicable to the defendant's conduct is 57 to 60 months' imprisonment.

### The Probation Department's Guidelines Calculation

The Probation Department agrees with the parties' offense level and criminal history calculations in the Plea Agreement and also calculates the applicable Guidelines range as 57 to 60 months' imprisonment.  (PSR ¶ 112).

Offense Conduct

Reichman, along with co-conspirators Anthony Huff (who was sentenced by this Court on June 4, 2015 to 12 years' imprisonment), Mathew Morris and Charles Antonucci engaged in a scheme to illegally purchase an Oklahoma insurance company called Providence Property and Casualty ("Providence P&C"). Huff, Morris, Antonucci and Reichman conspired to defraud the Oklahoma Insurance Department ("OID") and Oppenheimer (Reichman's employer and the financial institution that ultimately provided the loan for the purchase) by making and causing to be made material misrepresentations and omissions regarding the source of $37.5 million used to purchase Providence P&C.

Reichman's role in the scheme was to secure financing for the transaction.  (PSR ¶ 50).  Reichman agreed with his co-conspirators to cause his investment company-employer, Oppenheimer, to loan approximately $30 million to Park Avenue Insurance ("PAI") (a shell company controlled by Antonucci) so that PAI could purchase Providence P&C.  (Id.).  That loan was to be secured by the assets of the target company, Providence P&C.  (Id.).  As Reichman had repeatedly been warned, however, both by an Oppenheimer executive as well as the General Counsel of Providence P&C, the insurance company's assets were legally required to remain unencumbered for the benefit of the company's

policyholders.  (Id.).  Therefore, as Reichman was well aware, the proposed structure of the deal was illegal.  (Id.).  Despite that knowledge, Reichman proceeded to cause Oppenheimer to issue the $30 million margin loan, secured by Providence P&C's reserve assets.  (Id.).  In order to secure that approval, Reichman obtained a letter from Antonucci providing false information to Oppenheimer regarding the nature of the collateral securing the loan.  (Id.).

As a result of the illegal structure of the loan, the insurance company ultimately became insolvent.  (PSR ¶ 54). Before the company was placed into receivership, however, Reichman and his co-conspirators all reaped the financial rewards of their fraudulent conduct.  Huff, Morris and Antonucci took money out of the company for their financial benefit, whereas Reichman generated hundreds of thousands of dollars in commissions (approximately double what he had earned the previous year) as a result of his fraudulently obtained business relationship with the new owners of the company.  (PSR ¶¶ 53(b), 54).

## ARGUMENT

### I. A Guidelines Sentence Is Appropriate

The Government respectfully submits that a Guidelines sentence of imprisonment is warranted and fully supported by the factors set forth in Title 18, United States Code, Section

6

3553(a).  In particular, such an incarceratory sentence is sufficient but not greater than necessary: (i) to reflect the nature and circumstances of the defendant's offense; (ii) to reflect the seriousness of the offense, promote respect for the law and provide just punishment for the defendant's criminal conduct; and (iii) to afford adequate deterrence to others.  See 18 U.S.C. § 3553(a)(1), (a)(2)(A)-(B).

Reichman was the key figure in causing the issuance of a $30 million fraudulent loan by his employer, Oppenheimer.  He did that despite repeated warnings that the loan was illegal, and he did that for only one reason: greed.  Reichman saw in Huff, Antonucci and Morris the prospect of future business and future wealth.  And Reichman was determined to become a trusted member of their group, no matter how many warnings he needed to disregard, or how many different paths he needed to pursue in order to achieve that unlawful end.

For example, as Reichman admitted during his plea allocution, he attended a meeting with Providence P&C's General Counsel who explained that "under Oklahoma regulations, Providence's assets could not be used to secure the loan."  (PSR ¶ 63).  At that meeting, Reichman specifically (and falsely) stated that Oppenheimer would not leverage Providence's bonds as part of the $30 million loan.  That meeting was on December 17, 2008.

7

Approximately one month later, as Reichman notes in his sentencing submission, he was explicitly warned by John Saf, an Indiana-based Fixed Income Portfolio Manager with specific insurance company experience, that the loan was illegal. (Def. Mem. at 23). Saf memorialized his conversation with Saf in an email dated January 14, 2009. (Ex. A). As Saf recounted, he explained to Reichman that he believed the loan to be illegal, and that it would cause the insurance company to become technically insolvent. Reichman "promised not to do anything illegal." Still, Saf instructed Reichman to contact the General Counsel of Oppenheimer and/or his own compliance officer, to which Reichman agreed. There are no records, nor do any Oppenheimer employees have any recollections, of Reichman ever doing so.

Instead, Reichman chose to structure the deal piecemeal through various people and divisions of Oppenheimer, disclosing as little as possible to whichever individual he happened to be speaking, and without ever telling anyone what Saf had said. For example, Reichman tried to involve Oppenheimer Trust (a separate entity from Oppenheimer & Co.) before being instructed that a margin loan could not be issued on assets held in trust. He then sent a letter to Antonucci for his signature that falsely claimed that the assets in question where "excess capital." When that was insufficient, he simply told people

8

that the loan had been approved by the relevant individuals, despite never telling anyone what he knew about the illegality of the loan.

In other words, for over a month, Reichman tenaciously and ultimately successfully forced the loan through Oppenheimer's controls, knowing that what he was trying to accomplish was ultimately illegal.  That conduct resulted in an actual $30 million unlawful loan, caused the insolvency of an insurance company to the potential detriment of innocent policyholders, and resulted in approximately $10 million in losses to Oppenheimer.

That kind of brazen conduct is undoubtedly serious and cannot simply be deterred by the loss of Reichman's ability to engage in such conduct in the future.  Reichman knowingly put his employer and others at serious risk of financial loss and the punishment for his conduct should reflect that severity.  Accordingly, the Government respectfully submits that a Guidelines sentence of imprisonment is warranted in this case.

**II.   The Defendant's Arguments Do Not Merit a Below Guidelines Sentence**

The defendant makes a series of arguments in support of a non-incarceratory sentence – both minimizing his criminal conduct and challenging the Guidelines – that ultimately do

nothing to detract from the defendant's conduct or reduce the appropriate term of imprisonment.

### A. The Defendant's Efforts to Minimize His Conduct Should Be Rejected

Perhaps most disappointingly, the defendant spends a significant portion of his memorandum attempting to minimize his role in the criminal conduct to which he pleaded guilty. (Def. Mem. at 19-26). Rather than meriting a reduction in the appropriate sentence, the defendant's efforts to minimize his own role and shift blame to others make clear that a significant sentence of incarceration is necessary to reflect the severity of the <ins>defendant's</ins> criminal conduct.

To begin, the defendant claims that he did not participate in deceiving the Oklahoma regulators who needed to approve the transaction. (Def. Mem. at 19-20). While perhaps true as a technical matter, the defendant undoubtedly knew that the regulators would not approve a transaction that he knew to be illegal. Therefore, whether or not Reichman made affirmative misrepresentations to regulators (as opposed to making misrepresentations to others, which, as discussed above, he did), he certainly knew that those misrepresentations were a necessary step in order for the scheme to succeed.

Reichman next claims that he did not "share in the plunder" of the transaction. That is true only in so far as one were to

define "plunder" to exclude Reichman's participation in the financial profit of the scheme.  Each of the co-conspirators profited in different ways and by different amounts.  Reichman participated in the profits through commissions earned on the sale of the reserve bonds – sales that were required not only to cover claims for which the bonds were reserved, but also to repay the $30 million margin loan that was unlawfully secured by those very reserve assets.  It is particularly surprising that Reichman does not even acknowledge that he more than doubled his earnings in the year that followed the illegal transaction.

Next, Reichman claims that he did not foresee the collapse of the insurance company and the resulting harm from that collapse.  Again, while perhaps technically true, it is also true that <u>none</u> of the co-conspirators actually intended for the insurance company to become insolvent.  The last thing the co-conspirators wanted was for the company to go insolvent culminating in the appointment of a receiver with access to the books and records of the fraudulently obtained company.  On the other hand, Reichman certainly knew not only that the loan was illegal, but why it was illegal.  He knew, as Saf explained to him, that the loan would create a "whole in the balance sheet" and render the company "technically insolvent."  (Ex. A).  He also knew that the very purpose of the reserve assets was to protect against claims made by policyholders.  Thus, Reichman

11

knew that the regulations he was intentionally helping to evade were not bureaucratic red tape, but served legitimate purposes related to the financial well-being of the insurance company.

Finally, and most problematically, Reichman claims that others – namely Antonucci and Oppenheimer – are really to blame. He starts by selectively citing one particular prior statement by Antonucci, to suggest that Reichman, like the Oklahoma regulators and (possibly) Oppenheimer, was duped about the loan and the legality of leveraging the Providence's assets. Reichman does not mention, however, that in a meeting with the Government on February 4, 2015, Antonucci admitted that at least by December 2008, he knew the bonds could not be leveraged. Reichman similarly fails to note that, as recounted by Antonucci and corroborated by other meeting participants, Reichman lied in that December 2008 meeting about the plan to leverage Providence's reserve assets.  Reichman is aware of these statements because they were provided in the 3500 material produced by the Government prior to his plea.  The fact that Reichman now says that he was somehow misled about the legality of leveraging those bonds is flatly inconsistent with his false statement at the December 2008 meeting.

Turning to Oppenheimer, the victim of Reichman's fraud, Reichman argues that despite his admitted material omissions, in reality Oppenheimer knew enough to protect itself from Reichman.

12

Curiously, he cites John Saf's warnings to him to suggest that Oppenheimer, rather than Reichman, is really to blame. But it was Reichman, not Oppenheimer, that went from person to person and department to department, to find someone to approve the loan. And it was Reichman, not Oppenheimer, who asked Antonucci to sign a fraudulent "excess capital" letter to make it appear that the loan would not cause the consequences predicted in Saf's email. Ultimately, however, Reichman faults Oppenheimer for failing to "look over his shoulder." (Def. Mem. at 24). In other words, Reichman, a 54-year old adult with 30 years' experience in the financial industry, blames his employer for failing to babysit him. The fault, according to Reichman, is not Reichman's for engaging in criminal conduct, but his employer's for trusting Reichman not to engage in criminal conduct. The audacity of this argument is remarkable.

In sum, Reichman's efforts to deflect blame for his deceptive conduct, do not merit a non-incarceratory sentence. If anything, his failure to accept full responsibility underscores the necessity of a Guidelines sentence of incarceration in this case.

    **B.    The Fraud Guidelines Do Not Overstate the Severity of the Defendant's Conduct**

Reichman's challenges to the fraud Guidelines also do not merit the requested non-incarceratory sentence. Reichman

primarily relies on Judge Underhill's concurring opinion in United States v. Corsey, 723 F.3d 366 (2d Cir. 2013). In that opinion, Judge Underhill criticized the use of intended loss as a proxy for the severity of a defendant's conduct in a case in which the defendant attempted to lure a broker into procuring financing for "an imaginary Siberian oil pipeline," for which the defendant could offer "five billion dollars in U.S. Treasury notes." Id. at 368-69. Judge Underhill argued that "[t]he absence of any actual loss whatsoever and especially the absence of a victim significantly undercut any argument that this crime was particularly serious." Id. at 381 (Underhill, J., concurring). He observed that: "Because the plan was farcical, the use of intended loss as a proxy for seriousness of the crime was wholly arbitrary: the seriousness of this conduct did not turn on the amount of intended loss any more than would the seriousness of a scheme to sell the Brooklyn Bridge turn on whether the sale price was set at three thousand dollars, three million dollars, or three billion dollars." Id. at 379.

    Whatever the merits of those arguments with respect to the fantastical scheme for which the defendant in Corsey was convicted, they bear no relation to the facts of this case. Reichman entered into a conspiracy to fraudulently obtain an illegal $30 million loan. In that, he was successful. As a result of that scheme, an actual insurance company providing

14

actual insurance policies to actual policyholders was rendered insolvent. As a consequence, a real-life receiver was appointed and real-life state guaranty associations were required to cover millions of real dollars towards satisfying policyholder claims that were no longer secured by the illegally encumbered assets.

In other words, whatever criticism may be made about the fraud Guidelines in an abstract sense, in this case, the Government respectfully believes that the Guidelines appropriately reflect the severity of and harm caused by the defendant's conduct.

### C. A Guidelines Sentence Will Not Result in Unwarranted Sentencing Disparities

Next, Reichman argues that a Guidelines sentence will result in an unwarranted sentencing disparity with his co-conspirators in this scheme, in contravention of Section 3553(a)(6). As an initial matter, "the disparity referenced by 18 U.S.C. § 3553(a)(6) is national, not case-or district-specific." United States v. Hatala, 552 F. App'x 28, 31 (2d Cir. 2014). But "even assuming *arguendo* that 18 U.S.C. § 3553(a)(6) can support a reduced sentence designed to eliminate or diminish disparity between the sentences imposed on co-defendants, those co-defendants would have to be similarly situated." United States v. Fernandez, 443 F.3d 19, 31-32 (2d

15

Cir. 2006) (footnote omitted), abrogated on other grounds by Rita v. United States, 551 U.S. 338 (2007).

Here, Reichman points to the sentence imposed on Huff and the sentence he anticipates will be imposed on Antonucci as the bases for the unwarranted sentencing disparity.  With respect to Huff, the Government certainly agrees that the breadth and scope of Huff's repeated frauds render his criminal conduct qualitatively more serious that Reichman's.  For that, Huff was sentenced to 144 months' imprisonment, more than double the maximum sentence that could be imposed on Reichman.  Accordingly, a Guidelines sentence cannot and would not create an unwarranted sentencing disparity with Huff.

With respect to Antonucci, who has yet to be sentenced, in no way could the two be said to be similarly situated.  ████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████████  Accordingly, Reichman's efforts to compare himself to Antonucci should be rejected.

### D. The Defendant's Family Circumstances

Of all the arguments set forth in the defendant's submission, the only arguments the Government believes merit consideration by the Court are the defendant's history and characteristics, primarily the difficult medical circumstances of the defendant's family. (Def. Mem. at 5-10, 26-30). Unfortunately, however, it almost always the case that defendants' innocent families bear unmerited consequences of defendants' criminal conduct and subsequent incarceration. Thus, while the Government agrees that the Court could and should consider the circumstances of the defendant's family, after consideration of the other Section 3553(a) factors discussed above, the Government respectfully does not believe that the non-incarceratory sentence requested by the defendant is warranted.

**CONCLUSION**

For the foregoing reasons, the Government respectfully submits that a Guidelines sentence of imprisonment is sufficient, but not greater than necessary, to meet the goals of Section 3553(a).

Dated:    New York, New York
          July 8, 2015

                              Respectfully submitted,

                              PREET BHARARA
                              United States Attorney

                        By:   /s/ Daniel B. Tehrani
                              Daniel B. Tehrani
                              Janis M. Echenberg
                              Assistant United States Attorneys
                              Tel.: (212) 637-2455 / 2597